UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SHANNON YOUNG
7655 Arnold Drive
North Tonawanda, NY 14120

and

KEVIN YOUNG
419 Dutton Drive
Lewiston, NY 14092

   Petitioner,

v.

UNITED STATES DEPARTMENT OF LABOR
200 Constitution Ave., N.W.
Washington, D.C. 20210

and

UNITED STATES DEPARTMENT OF HEALTH
AND HUMAN SERVICES
200 Independence Avenue, S.W.
Washington, D.C. 20201

   Respondents.

Index No. _____

**PETITION TO SET ASIDE
DEEOIC FINAL DECISION
BASED ON AN IMPROPERLY
PERFORMED NIOSH
DOSE RECONSTRUCTION**

**Preliminary Statement**

1.  The Energy Employees Occupational Illness Compensation Program (EEOICP)

is a federal workers' compensation program administered by the U.S. Department of Labor that

provides medical benefits and compensation to nuclear weapons workers and their survivors if

the worker's  illnesses or conditions are found to be causally related to occupational exposure

to hazardous substances such as ionizing radiation at a facility involved in the manufacture of

nuclear weapons for the Department of Energy.

1

2.      Section 7384(a) provides congress's findings upon passing the EEOICPA, including:

(a)FINDINGS

The Congress finds the following:

(1)
Since World War II, Federal nuclear activities have been explicitly recognized under Federal law as activities that are ultra-hazardous. Nuclear weapons production and testing have involved unique dangers, including potential catastrophic nuclear accidents that private insurance carriers have not covered and recurring exposures to radioactive substances and beryllium that, even in small amounts, can cause medical harm.

(2)
Since the inception of the nuclear weapons program and for several decades afterwards, a large number of nuclear weapons workers at sites of the Department of Energy and at sites of vendors who supplied the Cold War effort were put at risk without their knowledge and consent for reasons that, documents reveal, were driven by fears of adverse publicity, liability, and employee demands for hazardous duty pay.

(3)
Many previously secret records have documented unmonitored exposures to radiation and beryllium and continuing problems at these sites across the Nation, at which the Department of Energy and its predecessor agencies have been, since World War II, self-regulating with respect to nuclear safety and occupational safety and health. No other hazardous Federal activity has been permitted to be carried out under such sweeping powers of self-regulation.

(4)
The policy of the Department of Energy has been to litigate occupational illness claims, which has deterred workers from filing workers' compensation claims and has imposed major financial burdens for such employees who have sought compensation. Contractors of the Department have been held harmless and the employees have been denied workers' compensation coverage for occupational disease.

(5)
Over the past 20 years, more than two dozen scientific findings have emerged that indicate that certain of such employees are experiencing increased risks of dying from cancer and non-malignant diseases. Several

of these studies have also established a correlation between excess diseases and exposure to radiation and beryllium.

**(6)**
While linking exposure to occupational hazards with the development of occupational disease is sometimes difficult, scientific evidence supports the conclusion that occupational exposure to dust particles or vapor of beryllium can cause beryllium sensitivity and chronic beryllium disease. Furthermore, studies indicate than 98 percent of radiation-induced cancers within the nuclear weapons complex have occurred at dose levels below existing maximum safe thresholds.

**(7)**
Existing information indicates that State workers' compensation programs do not provide a uniform means of ensuring adequate compensation for the types of occupational illnesses and diseases that relate to the employees at those sites.

**(8)**
To ensure fairness and equity, the civilian men and women who, over the past 50 years, have performed duties uniquely related to the nuclear weapons production and testing programs of the Department of Energy and its predecessor agencies should have efficient, uniform, and adequate compensation for beryllium-related health conditions and radiation-related health conditions.

**(9)**
On April 12, 2000, the Secretary of Energy announced that the Administration intended to seek compensation for individuals with a broad range of work-related illnesses throughout the Department of Energy's nuclear weapons complex.

**(10)**
However, as of October 2, 2000, the Administration has failed to provide Congress with the necessary legislative and budget proposals to enact the promised compensation program.

42 U.S.C. § 7384(a).

3.     These ideas are echoed in an Executive Order signed by President Clinton on

December 7, 2000:

3

Section 1. Policy. Since World War II, hundreds of thousands of men and women have served their Nation in building its nuclear defense. In the course of their work, they overcame previously unimagined scientific and technical challenges. Thousands of these courageous Americans, however, paid a high price for their service, developing disabling or fatal illnesses as a result of exposure to beryllium, ionizing radiation, and other hazards unique to nuclear weapons production and testing. Too often, these workers were neither adequately protected from, nor informed of, the occupational hazards to which they were exposed.

Existing workers' compensation programs have failed to provide for the needs of these workers and their families. Federal workers' compensation programs have generally not included these workers. Further, because of long latency periods, the uniqueness of the hazards to which they were exposed, and inadequate exposure data, many of these individuals have been unable to obtain State workers' compensation benefits. This problem has been exacerbated by the past policy of the Department of Energy (DOE) and its predecessors of encouraging and assisting DOE contractors in opposing the claims of workers who sought those benefits. This policy has recently been reversed.

While the Nation can never fully repay these workers or their families, they deserve recognition and compensation for their sacrifices. Since the Administration's historic announcement in July of 1999 that it intended to compensate DOE nuclear weapons workers who suffered occupational illnesses as a result of exposure to the unique hazards in building the Nation's nuclear defense, it has been the policy of this Administration to support fair and timely compensation for these workers and their survivors. The Federal Government should provide necessary information and otherwise help employees of the DOE or its contractors determine if their illnesses are associated with conditions of their nuclear weapons-related work; it should provide workers and their survivors with all pertinent and available information necessary for evaluating and processing claims; and it should ensure that this program minimizes the administrative burden on workers and their survivors, and respects their dignity and privacy. This order sets out agency responsibilities to accomplish these goals, building on the Administration's articulated principles and the framework set forth in the Energy Employees Occupational Illness Compensation Program Act of 2000. The Departments of Labor, Health and Human Services, and Energy shall be responsible for developing and implementing actions under the Act to compensate these workers and their families in a manner that is compassionate, fair, and timely. Other Federal agencies, as appropriate, shall assist in this effort.

Executive Order 13179 dated 12/7/2000.

4.      Mr. Young developed prostate cancer after working at Electro-Metallurgical and Linde Ceramics in the 1940s and 1950s.

5.      In order to determine whether his cancer was caused by ionizing radiation at a qualified facility, the EEOICP looks to an estimate of radiation dose received by the worker during his or her employment at qualified facilities.

6.      This Petition seeks to set aside the Final Decision denying Mr. Young's EEOICP claim because the radiation dose estimate used to adjudicate Mr. Young's claim did not estimate his internal dose for the time period 1942-1945. The NIOSH Dose Reconstruction states:

> **Electro Metallurgical**
> No dose monitoring records could be found for Mr. Young's employment at Electro Metallurgical Company. NIOSH has determined and the Secretary of Health and Human Services has concurred that it is not feasible to reconstruct internal radiation exposures for all Atomic Weapons Employer employees who worked at Electro Metallurgical Company from August 13, 1942 through December 31, 1947 inclusive for Mr. Young.

*See* Radiation Dose Reconstruction for Arnold Young dated December 16, 2016.

7.      Petitioners believe that NIOSH and the Secretary of Health and Human Services lacked the statutory authority to refuse to reasonably estimate an internal radiation dose for Mr. Young for the period August 13, 1942 through December 31, 1947.

8.      The EEOICPA itself and the regulations promulgated thereunder require a dose reconstruction based on reasonable estimates. NIOSH itself made a reasonable dose estimate for Mr. Young's internal dose at Electro Metallurgical in a 2011 dose reconstruction it prepared for Mr. Young.

9.      The 2011 dose reconstruction states:

**Electro Metallurgical**

No dose monitoring records could be found for Mr. Young at Electro Metallurgical. In accordance with the NIOSH Internal Dose Reconstruction Implementation Guideline, the IMBA program was used to calculate the dose from exposure to both ingested and inhaled alpha radioactivity based on intake quantities (Table 5 below) provided in Table 2 of the technical basis document. Solubility Type M was used as a claimant-favorable assumption for assigning dose. Since Mr. Young's position at Electro Metallurgical was as a welder, internal exposure values for the job category of "Supervisors / Laborers" was assigned.

Table 5. Internal Exposures

| Dates | Nuclide | Operation Phase / Job Category | Intake dpm/day | | IREP Distribution |
|---|---|---|---|---|---|
| | | | Inhalation | Ingestion | |
| 04/01/1943-10/07/1945 | Uranium-234 | Operations Supervisors/Laborers | 8159 | 158 | Constant |

10.      This petition focuses on the decision by NIOSH to stop estimating internal dose for Mr. Young and the statutory and regulatory standards that address whether that decision arose out of a permissible exercise of its discretion or an *ultra vires* violation of the statute and the regulations.

11.      Petitioners believe that NIOSH applied the wrong statutory standard and exceeded its authority by failing to estimate Mr. Young's internal dose for this time period.

12.      The absence of statutory authority for the refusal to estimate this internal dose requires that the Department of Labor's Final Decision be set aside and that the Secretary of Health and Human Services and the Secretary of Labor be ordered to prepare a new dose reconstruction that makes the proper dose estimate and a new Final Decision that is based on a complete dose reconstruction.

13.      As Mr. Young's dose reconstruction resulted in a probability of causation (PoC) (likelihood that radiation caused his cancer) of 49.18%, and causation is established by a 50%

or greater probability of causation (PoC), it is likely that a complete dose reconstruction will lead to compensation for Mr. Young's sons.

## The Claimants

14.     Mr. Shannon Young and Mr. Kevin Young, (hereinafter "the Claimants") by their attorney R. Hugh Stephens, ask this Court to set aside a Final Decision in their Energy Employees Occupational Illness Compensation Program Act (EEOICPA or the Act) claim (42 U.S.C. § 7384 *et seq.*) dated September 12, 2017 (attached as exhibit 1).

15.     This Petition seeks to overturn a Final Decision in this Federal Workers Compensation, Department of Energy Employee Occupational Illness Compensation (DEEOIC) (a department of the United States Department of Labor's (USDOL) Office of Workers Compensation Programs (OWCP)) claim based on a partial radiation dose reconstruction performed by the National Institute of Occupational Safety and Health (NIOSH) (an institute of the United States Department of Health and Human Services) which failed to estimate certain radiation doses in violation of the EEOICPA statute which, in turn, caused this claim to be denied. The EEOICPA statute does not provide for a denial based on a partial dose reconstruction under the circumstances presented by this claim.

## Jurisdiction

16.     This Court has jurisdiction over this matter by virtue of the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* ("APA"). The EEOICPA, 42 U.S.C. § 7385s-6, also provides for federal court jurisdiction over EEOICPA Final Decisions ("A person adversely affected or aggrieved by a final decision of the Secretary under this part may review that order in the United States district court in . . . the District of Columbia") although this provision

appears to address only Part E of the EEOICPA. This matter also raises a federal question under 28 U.S.C. § 1331.

17.     Mr. Shannon Young lives at 7655 Arnold Drive North Tonawanda, New York 14120.

18.     Mr. Kevin Young lives at 419 Dutton Drive Lewiston, New York 14092.

19.     Electro Metallurgical is located in Niagara Falls, New York.

20.     The Linde Ceramics Plant is located in Tonawanda, New York.

21.     Part B of the Energy Employees Occupational Illness Compensation Act (EEOICPA), provides $150,000 in compensation to the survivors of those who manufactured nuclear weapons for the Department of Energy (DOE) where those workers have been diagnosed with cancer and the Department of Labor (DOL) has determined that the cancer was caused by the worker's occupational exposure to radiation.

22.     As established in Executive Order 13179, the "Secretary of Labor shall have primary responsibility for administering the Program" and the

(b)  .  .  . Secretary of Health and Human Services shall:

(i) No later than May 31, 2001, promulgate regulations establishing:

(A) guidelines, pursuant to section 3623(c) of the Act, to assess the likelihood that an individual with cancer sustained the cancer in the performance of duty at a Department of Energy facility or an atomic weapons employer facility, as defined by the Act; and

(B) methods, pursuant to section 3623(d) of the Act, for arriving at and providing reasonable estimates of the radiation doses received by individuals applying for assistance under this program for whom there are inadequate records of radiation exposure;

(ii) In accordance with procedures developed by the Secretary of Health and Human Services, consider and issue determinations on petitions by classes of employees to be treated as members of the Special Exposure Cohort;

(iii) With the assistance of the Secretary of Energy, apply the methods promulgated under subsection (b)(i)(B) to estimate the radiation doses received by individuals applying for assistance;

Executive Order 13179, dated December 7, 2000.

### The NIOSH Radiation Dose Reconstruction (RDR) Process

23.     The causation determination relied upon by the DOL in its adjudication of

EEOICPA claims is based on a NIOSH radiation dose reconstruction which is an estimate of

radiation dose received by the worker during covered employment.

24.     This radiation dose estimate is combined with certain other information such as

the worker's age, sex, date of diagnosis, and type of cancer, and this information is run through

a statistical model based on medical data obtained from residents of Hiroshima and Nagasaki

after atomic bombs were dropped on those cities.

25.     The statistical model produces a percentage that represents the probability that

radiation caused the worker's cancer and that it was not caused by some other factor such as

genetics or other environmental exposures.

### The Probability of Causation (PoC)

26.     That percentage is referred to as the Probability of Causation and abbreviated

"PoC."

27.     If the Radiation Dose Reconstruction Report (RDRR) results in a Probability of

Causation (PoC) that equals or exceeds 50%, radiation is deemed to have been the cause of the

cancer for purposes of the Energy Employees Occupational Illness Compensation Program

(EEOICP).

### The External Radiation Dose Estimate

28.     The dose estimates on which the dose reconstruction is built come from

estimates of two types of radiation dose: external dose and internal dose. Dosimeter badges

(typically translucent dosimeter (TLD) badges) worn on a worker's clothing measure external

dose or the radiation dose that emits from a radioactive source and makes contact with the worker from outside his or her body.

### The Internal Radiation Dose Estimate

29.     An internal dose of radiation is measured through the use of bioassays which measure radiation that has been ingested, inhaled, or otherwise taken into the body. An example of a bioassay is an analysis of a urine sample.

30.     Similarly, a whole body count measures radioactive materials present in the body of a worker.

31.     The estimates of external dose and internal dose are guided by peer reviewed documents that together make up the National Institute of Occupational Safety and Health (NIOSH) dose reconstruction methodology.

32.     Two documents at the heart of the NIOSH dose reconstruction methodology are the External Dose Reconstruction Implementation Guideline and the Internal Dose Reconstruction Implementation Guideline.

33.     These documents establish the NIOSH Dose Reconstruction method based in part on a hierarchy of data.

34.     The external dose reconstruction implementation guideline describes the hierarchy of external dose data as beginning with the specific dosimeter badge data from the dosimeters worn by the specific worker and ends with general information related to the source term and generally applicable radiation control limits.

Table 1.1 Hierarchy of Data Sources for Dose Reconstruction

| Hierarchy | Data Source | Examples |
|---|---|---|
| 1 | Personal Dosimeter | Film Badge, TLD |
| 2 | Personal Monitors | Pocket Ionization Chambers |
| 3 | Co-Worker Data | Film Badge, TLD, Pocket Ionization Chambers, etc. |
| 4 | Area Monitoring | Work Place Radiation Surveys, Ambient Air room monitors, duration of exposure |
| 5 | Source Term | Source strength, distance from source, duration of exposure, and shielding information |
| 6 | Radiation Control Limits | Generally, workplace posting has been required when the dose rate exceeded 0.025 mSv/hr. |

*See* External Dose Reconstruction Implementation Guideline OCAS Document No. OCAS-IG-001s.

35.     The Internal Dose Reconstruction Implementation Guideline addresses data used to prepare an internal dose estimate beginning with specific worker bioassays and whole body counts and ending with general information about source terms and breathing zone availability. It provides:

In the absence of air sample measurements, contamination surveys can provide a quantitative indication of the amount of dispersible material in the work area available to create airborne contamination. Consideration should be given to types of work activities, the type of material, and ventilation or other forces that could cause the material to be suspended in air. Resuspension factors can be used, provided enough information is available to properly classify the material and conditions. Some references for resuspension factors are available (NRC, 1993) but the basis of these references must be reviewed to ensure the factors apply to the particular situation.

Once the radionuclide concentration in the breathing zone is established, the individual's intake and deposition of radionuclides must be estimated. When no other information is available, the ICRP 66 defaults for a "reference worker" will be used for deposition fractions, particle size, etc. It will also be necessary to estimate the individual's exposure time. For a normal workday, the average airborne concentrations and average worker exposure time should be acceptable with minimal error. For unusual or abnormal conditions that created much higher than normal airborne concentrations, a more rigorous examination of the exposure time should be conducted. Typical exposure time and abnormal events can often be obtained from the claimant interview

11

*See* Internal Dose Reconstruction Implementation Guideline OCAS Document No. OCAS-IG-002.

36.     At the top of the hierarchy of data is the employee's individual dosimeter data, bioassays and whole body counts. At the bottom of the hierarchy is data arising out of knowledge about the source term, or the characteristics of the radioactive material being processed, and historical knowledge about the type of shielding that was used during the applicable time period as well as other historical information available about the work processes involved and the exposure that likely arose out of these processes.

37.     As this program addresses exposures that were experienced as far back as the 1940s and radiation exposure monitoring data is often inadequate, partially missing, or completely absent, processes have been developed to confront the limitations on radiation exposure data in the EEOICPA Dose Reconstruction statute and in the EEOICPA regulations.

38.     Section 7384n describes the work that the President has been directed by Congress to perform in connection with radiation exposure estimates:

**Exposure in the performance of duty**

(d) Methods for Radiation Dose Reconstructions, - (1) The President shall . . . establish by regulation methods for arriving at reasonable estimates of the radiation doses received by an individual specified in subparagraph (B) of section 73841(9) [an individual who contracted cancer after beginning work at a covered facility who is not a member of a Special Exposure Cohort (SEC) class] of this title at a facility specified in that subparagraph by each of the following employees:

> (A) An employee who was not monitored for exposure to radiation at such facility.
> (B) An employee who was monitored inadequately for exposure to radiation at such facility.
> (C) An employee for whom records of exposure to radiation at such facility are missing or incomplete.

42 U.S.C. § 7384n.

39.     This language is also found in the regulations promulgated by the Department of Labor.

40.     Section 82.3(a) of the regulations promulgated by the Department of Labor states:

> Dose reconstructions are to be conducted for the following covered employees with cancer seeking compensation under EEOICPA: An employee who was not monitored for exposure to radiation at Department of Energy (DOE) or Atomic Weapons Employer (AWE) facilities; an employee who was monitored inadequately for exposure to radiation at such facilities; or an employee whose records of exposure to radiation at such facility are missing or incomplete.

42 CFR § 82.3(a)

41.     The President has delegated this work to the Secretary of Labor and the Secretary of Labor, in turn, has delegated this work to NIOSH, which performs this work through its contractor, Oak Ridge Associated Universities (ORAU), and the Health Physicists it employs. See Executive Order 13179.

42.     The standard that the Health Physicists must meet as they work with limited data is defined in terms of reasonableness.  "The President shall . . . establish by regulation methods for arriving at reasonable estimates of the radiation doses." 42 U.S.C. § 7384n.

43.     The regulations expand on the definition of "reasonable estimates".  Section 82.2(a) provides:

> If radiation exposure in the workplace environment cannot be fully characterized based on available data, default values based on reasonable and scientific assumptions may be used as substitutes. For dose reconstructions conducted in occupational illness compensation programs, this practice may include use of assumptions that represent the worst case conditions.

42 CFR § 82.2(a).

44.     This idea of "reasonable estimates" based on limited data is expanded to include "default values based on reasonable and scientific assumptions" and then further defined in 42 CFR § 82.2(c), which provides:

> If neither adequate worker nor workplace monitoring data are available, the dose reconstruction may rely substantially on process description information to analytically develop an exposure model.

42 CFR § 82.2(c).

45.     The notion of reasonable, scientific estimates and analytically developed exposure models based on process descriptions and "worst case conditions" is further refined with a reference to the purpose of the statute and its intention to assist sick workers by resolving the absence of data in the worker's favor by maximizing dose where data is not sufficiently specific.

46.     Section 82.18(a) of the regulations provides:

> NIOSH will calculate the dose to the organ or tissue of concern using the appropriate current metabolic models published by ICRP. Using data available to NIOSH, the models will be based on exposure conditions representative of the work environment. When NIOSH cannot establish exposure conditions with sufficient specificity, the dose calculation will assume exposure conditions that maximize the dose to the organ under consideration.

42 CFR § 82.18(a).

47.     Section 82.3 also addresses how undetected and unrecorded doses are to be managed.

48.     Section 82.3(a) provides:

> Technical limitations on radiation monitoring technology and procedures will require HHS to evaluate each employee's recorded dose. In most, if not all cases, monitoring limitations will result in possibly undetected or unrecorded doses, which are estimated using commonly practiced dose reconstruction methods and would have to be added to the dose record.

42 CFR § 82.3(a).

**The Special Exposure Cohort (SEC) Presumption of Causation**

49.     An entirely separate causation requirement is established under EEOICPA

section 7384q to manage the circumstance where the availability of radiation exposure data is

so limited that some aspect of the radiation dose estimate cannot be described as sufficiently

accurate to deny a claim in this claimant favorable program.

50.     Section 7384q provides:

> Subject to the provisions of section 73841(14)(c) of this title, the
> members of a class of employees at a Department of Energy Facility, or
> at an Atomic Weapons Employer facility may be treated as members of
> the Special Exposure Cohort for purposes of the compensation program
> if the President, upon recommendation of the Advisory Board on
> Radiation and Worker Health determines that –
> > (1) It is not feasible to estimate with sufficient accuracy the
> > radiation dose that the class received; and
> > (2) there is a reasonable likelihood that such radiation dose may
> > have endangered the health of members of the class.

42 U.S.C. § 7384q.

51.     Consistent with section 7384q, if there is a determination that: "it is not feasible

to estimate with sufficient accuracy the radiation dose that the class received," and "there is a

reasonable likelihood that such radiation dose may have endangered the health of members of

the class," a Special Exposure Cohort may be established.

52.     In this context, causation for purposes of compensation under Part B is not

established through the radiation dose reconstruction process for a select group of claimants

known as the Special Exposure Cohort (SEC).

53.     In order to be a member of the Special Exposure Cohort (SEC), it is necessary

to have one of 22 designated cancers (the list of designated cancers includes many types of

cancer but does not include skin and prostate cancer as well as certain other types of cancer).

54.     It is also necessary to show that the worker worked at an SEC designated facility for at least 250 days during the designated SEC time period.

55.     For those workers who have one of the 22 cancers and who worked at a designated SEC facility for 250 days during the SEC time period, causation is established based on a presumption that the occupational exposure to radiation at the SEC facility caused the cancer.

56.     For qualified SEC cancer claims that meet the 250 day requirement, no Radiation Dose Reconstruction Report (RDRR) is prepared by NIOSH.

57.     The Special Exposure Cohort (SEC) designation is established by the Secretary of Health and Human Services based on the recommendation prepared by the Presidential Advisory Board on Radiation and Worker Health (ABRWH) and no contrary congressional action.

58.     The Advisory Board on Radiation and Worker Health (ABRWH) is also tasked with addressing questions related to NIOSH Dose Reconstruction methodology.

59.     This petition addresses what Petitioners believe is a serious error in the interpretation and the implementation of the EEOICPA statute by the United States Department of Labor, the United States Department of Health and Human Services (through NIOSH), and the ABRWH that has caused the Youngs' claims to be wrongfully denied based on a partial dose reconstruction. The EEOICPA statute does not permit a claim to be denied based on a partial dose reconstruction unless a reasonable dose estimate cannot be calculated.

60.     While it is petitioners' view that a reasonable dose estimate can always be calculated in this program based on information about source term, the processes involved and the types of shielding used during the relevant time period, a reasonable dose estimate was

actually prepared by NIOSH in this matter in 2011 so whether or not a reasonable dose

reconstruction can always be prepared need not be addressed in this action.

### The Facts Related to the Young's Claim

61.     Mr. Arnold Young worked as a welder at Electro Metallurgical during the

period, 1943-1945.

62.     A radiation dose reconstruction was prepared in 2011 that assigned an internal

dose estimate for the 1943-1945 Electro Metallurgical employment for Mr. Young.

63.     1943-1945 is a period during which few precautions were taken to prevent a

worker from inhaling radioactive dust while working at a designated DOE facility like Electro

Metallurgical.

64.     In 2014, the Advisory Board on Radiation and Worker Health (ABRWH) made

a determination that the radiation exposure data available to prepare an estimate of internal

dose at Electro Metallurgical was so limited that it is not feasible to prepare a dose estimate

that is sufficiently accurate to deny a claim in this program and that it was reasonably likely

that the radiation dose received by workers at that facility during that time period may have

endangered the health of the members of the class and a Special Exposure Cohort (SEC) was

recommended to the Secretary of Health and Human Services. This determination was based

on the criteria set forth in section 7384q related to Special Exposure Cohort (SEC) petitions.

65.     Based on the determination that it is not feasible to perform a sufficiently

accurate internal dose estimate at Electro Metallurgical for the period 1943-1945 and that a

Special Exposure Cohort (SEC) should be created for that time period at that facility, NIOSH

made the following recommendation for an addition to the Special Exposure Cohort (SEC):

> All employees of the Department of Energy, its predecessor agencies,
> and their contractors and subcontractors who worked at the Electro

Metallurgical site in Niagara Falls, New York, from August 13, 1942
through December 31, 1947, for a number of work days aggregating at
least 250 work days, occurring either solely under this employment, or
in combination with work days within the parameters established for one
or more other classes of employees included in the Special Exposure
Cohort.

*See* EEOICPA Circular No. 12-09.

66.     On the strength of this recommendation, the Secretary of Health and Human

Services sent a letter to Congress recommending acceptance of the Special Exposure Cohort

(SEC). By failing to take action to prevent the establishment of the SEC, Congress permitted

its establishment and the Special Exposure Cohort was established on June 10, 2012.

67.     On December 6, 2016 a new dose reconstruction was prepared for Mr. Young.

68.     The new Probability of Causation (PoC) was 49.18%, just 0.82 of 1 percentage

point short of the 50% needed for compensation.

69.     NIOSH and the Secretary of Health and Human Services take the position that it

is not feasible to reconstruct an internal radiation dose for the period 1943-1945 for Mr. Young

based on the finding that a sufficiently accurate dose estimate cannot be prepared, and the

resulting establishment of the SEC period for that facility.

70.     The ABRWH has substituted the standard under Section 7384q which requires

the establishment of an SEC based on the inability of NIOSH to perform a "sufficiently

accurate" dose estimate for the standard under Section 7384n and Section 82.3(a) of the

regulations which require NIOSH to perform a "reasonable" dose estimate even in the face of

very limited data.

**Two Standards of Causation**

71.     There are two separate standards that relate to causation under the EEOICPA

statute.

72.     The first standard requires that dose reconstructions be performed based on "reasonable estimates" of radiation dose.

73.     The second standard relates to claims where a worker has one of the 22 designated cancers (prostate cancer is not one of the 22 designated cancers) and 250 days at the designated facility during a designated SEC period.

74.     If during this period it is not "feasible" to prepare a "sufficiently accurate" dose estimate and there is a reasonable likelihood that such radiation dose may have endangered the health of members of the class, then a Special Exposure Cohort (SEC) is established and the members of the SEC are compensated based on the presumption that their cancers were caused by their occupational radiation exposure at an SEC facility during an SEC time period.

75.     The structure of the statute and its terms show that the establishment of an SEC under section 7384q – a presumption based on the inability to prepare a "sufficiently accurate dose estimate" should have no impact on the claims of those whose dose reconstructions are prepared based on the dictates of section 7384n — "reasonable" dose estimates.

76.     Mr. Young had a dose reconstruction in 2011 which assigned a radiation dose estimate for internal dose during the period 1943-1945.

77.     The following is an excerpt of the 2011 radiation dose reconstruction prepared by NIOSH that assigns Mr. Young internal dose for the period 1943-1945:

Table 5. Internal Exposures

| Dates | Nuclide | Operation Phase / Job Category | Intake dpm/day | | IREP Distribution |
|-------|---------|-------------------------------|----------------|----------|-------------------|
|       |         |                               | Inhalation | Ingestion |                   |
| 04/01/1943-10/07/1945 | Uranium-234 | Operations Supervisors/Laborers | 8159 | 158 | Constant |

*See* NIOSH Dose Reconstruction dated December 29, 2011.

19

78.     In 2014, the Advisory Board on Radiation and Worker Health recommended that a Special Exposure Cohort (SEC) be established for Electro Metallurgical for the years 1942-1947.

79.     Based on the decision to establish a Special Exposure Cohort (SEC) at Electro Metallurgical under Section 7384q, NIOSH and the Secretary of Health and Human Services decided that it is not feasible for NIOSH to estimate internal dose at Electro Metallurgical between 1942 and 1947.

80.     A dose reconstruction is performed based solely on the dictates of section 7384n which only requires that a "reasonable estimate" be performed.

81.     Notions of the feasibility of a "sufficiently accurate" dose estimate are relevant to the establishment of a Special Exposure Cohort (SEC). Once an SEC has been established, its establishment should have no impact on claims that do not qualify for the SEC causation presumption.

82.     The requirement that a reasonable dose estimate be performed is contained in Section 7384n and the statute specifically acknowledges the extremely limited nature of data available to make a dose estimate under certain circumstances:

§ 7384n.  Exposure in the performance of duty

(d)  METHODS FOR RADIATION DOSE RECONSTRUCTIONS—(1)  The President shall, through any Federal agency (other than the Department of Energy) or official (other than the Secretary of Energy or any other official within the Department of Energy) that the President may designate, establish by regulation methods for arriving at reasonable estimates of the radiation doses received by an individual specified in subparagraph (B) of section 7384l(9) of this title at a facility specified in that subparagraph by each of the following employees:

(A)  An employee who was not monitored for exposure to radiation at such facility.

(B)  An employee who was monitored inadequately for exposure to radiation at such facility.

(C)  An employee for whom records of exposure to radiation at such facility are missing or incomplete.

*See* 42 U.S.C. § 7384q.

83.     The point of section 7384n is that no matter what the limitations are with respect to individual monitoring data, a reasonable dose estimate can be calculated based, for example, on process information.

84.     While in the complete absence of any data related to the types of radioactive materials being processed and the type of processes being performed, it might be appropriate to characterize a reasonable or scientific dose estimate as simply impossible to estimate even one based on "worse case conditions."  *See* 42 CFR § 82.12.

85.     But in this instance NIOSH itself prepared a detailed estimate back in 2011 of Mr. Young's internal dose at Electro Metallurgical during the years 1943-1945.

86.     NIOSH should not be permitted to characterize that dose as unreasonable and/or unscientific such that that dose would be deemed impossible to reasonably calculate.

87.     The result of such a position is that the children of Mr. Young are not compensated because instead of the 2011 dose estimate, the claim is adjudicated as though Mr. Young was not exposed to any radiation during that time period.

88.     Whatever the limits are on NIOSH's ability to reasonably estimate dose, it is certain that an estimate of zero dose is not reasonable or accurate because it is clear that Mr. Young was exposed to some radiation during that time period.

89.     But this Petition is not about an unfortunate outcome but a failure of the U.S. Department of Labor and the U.S. Department of Health and Human Services to properly implement the statutes and regulations that guide the administration of the EEOICPA program.

21

90.     This program is referred to by the Department of Labor and the Department of Health and Human Services as a "claimant favorable" program.

91.     The idea of a claimant favorable program is based on the goals of the program and the history involved; nuclear weapons workers were exposed to ultra-hazardous materials without their knowledge or consent by the Department of Energy and its contractors. The Department of Energy and its contractors then attempted to and often succeeded in preventing those workers from receiving just compensation.

92.     The government has decided that under these circumstances it is more important to make sure every worthy claim is paid than it is to make sure every unworthy claim is not paid.

93.     The point here and the result is that it takes better evidence to deny a claim in this program than to accept a claim in this program.

94.     So Section 7384q sets a very high bar in terms of the evidence that is necessary to deny a claim with a dose reconstruction.

95.     As a general matter in the absence of site specific data addressing external and internal dose, it is difficult to describe a dose reconstruction as "sufficiently accurate".

96.     Under these circumstances, a reasonable dose estimate can be prepared but the differences between one facility and another do not permit such an estimate based on data from another facility to be described as "sufficiently accurate" to deny a claim at a facility.

97.     Under these circumstances, claims are accepted based on a presumption of causation in spite of the likelihood that some of those claims accepted based on this presumption would have been denied in the dose reconstruction process.

98.     This makes sense where the Department of Energy (DOE) and its contractors exposed these workers to ultra-hazardous radioactive materials and DOE and its contractors are not in a position to address the relationship between that exposure and whether it caused the worker's cancer with "sufficiently accurate" general site specific dose data.

99.     The data necessary to accept a claim under these circumstances need not meet such a rigorous test.

100.    If data can be described as reasonable and scientific and not as speculation, that data should be permitted to support the acceptance of a claim.

101.    The regulations go even further by explaining that gaps in the evidence can be filled by presuming "worst case conditions."

102.    The statute creates two different triggers relative to the sufficiency of evidence for different purposes of the Program.

103.    The first trigger is when the available data is sufficient to be characterized as "reasonable" and not speculation.

104.    The second trigger is when the data can be fairly described as "sufficiently accurate" to form the basis of a dose reconstruction which denies a claimant's claim.



105.    In light of the above, petitioners respectfully request that this court set aside the

Final Decision dated September 12, 2017, and order the Secretary of Health and Human

Services to prepare a complete dose reconstruction for Mr. Young and to order the Secretary of

Labor to adjudicate that claim once a reasonable internal dose has been assigned to Mr. Young

for the years 1943-1945, and for such other and further relief as the nature of this cause may

require and that this Court deems just and appropriate.

DATED:  Washington, D.C.
           November 9, 2017

                                        LAW OFFICES OF STEPHENS &
                                        STEPHENS, LLP

                                        By__/s/  R. Hugh Stephens_____
                                              R. Hugh Stephens

                                        Attorneys for Plaintiffs Kevin Young
                                        and Shannon Young
                                        2495 Main Street
                                        Suite 442
                                        Buffalo, New York 14214
                                        (716) 852-7490

LAW OFFICES OF NAT POLITO, PC

By    /s/  Nat N. Polito
      Nat N. Polito (Bar Number 453365)

Attorneys for Plaintiffs Kevin Young
and Shannon Young
1776 K Street, NW
Washington, DC 20006
(202) 463-0110