# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SHANNON YOUNG and KEVIN YOUNG,

    Plaintiffs,

    v.

U.S. DEPARTMENT OF LABOR and
U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES,

    Defendants.

Civil Action No. 17-2428 (JDB)

## MEMORANDUM OPINION

Shannon and Kevin Young seek compensation under the Energy Employees Occupational Illness Compensation Program Act ("EEOICPA") as sons of a former Department of Energy ("DOE") contract employee who died of cancer. The Department of Labor ("DOL") denied the Youngs' claim for compensation after finding that there was a less-than-even chance that their father's cancer was caused by radiation exposure during his DOE employment. Plaintiffs dispute that finding, arguing that it was based on an incomplete "radiation dose reconstruction" prepared by the National Institute for Occupational Safety and Health ("NIOSH"), a component agency of the Department of Health and Human Services ("HHS").[1] The Youngs claim that this incomplete dose reconstruction was conducted under an unlawful HHS policy regarding the feasibility of dose estimates that is arbitrary and capricious and fails to conform to HHS's statutory mandate.

HHS and DOL move to dismiss plaintiffs' suit for lack of standing under Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6). As explained below, the Court will deny the

---

[1] For purposes of clarity, and because NIOSH's conduct is part of and attributable to HHS, this opinion refers to NIOSH as HHS.

motion to dismiss as to plaintiffs' claim against HHS because, at this stage of the proceedings and with the limited administrative record before this Court, plaintiffs have standing and plausibly allege that HHS's dose reconstruction policy is unlawful under the Administrative Procedure Act ("APA"). Plaintiffs, however, fail to state a claim against DOL, and thus the Court will grant the motion to dismiss as to DOL.

## LEGAL BACKGROUND

Congress passed the EEOICPA in 2000 to ensure that former DOE and DOE contract employees who "performed duties uniquely related to the nuclear weapons production and testing programs" receive "efficient, uniform, and adequate compensation for . . . radiation-related health conditions." 42 U.S.C. § 7384(a)(8). Part B of the EEOICPA provides, among other things, for a payment of $150,000 to surviving family members of employees who have died from cancer related to radiation exposure in the performance of their duties at covered DOE facilities. See Id. §§ 7384l(1)(B), 7384l(9), 7384n(b), 7384s(a)(1). DOL determines eligibility and adjudicates claims for EEOICPA compensation and benefits. See Exec. Order. No. 13,179, 65 Fed. Reg. 77,487, 77,488 (Dec. 7, 2000); 20 C.F.R. § 30.1. To be eligible for compensation, an employee or survivor of an employee must show (1) that the employee was diagnosed with cancer; (2) that the employee was a DOE employee or contractor who contracted cancer after employment at a covered facility; and (3) that the cancer was "at least as likely as not" related to his or her employment at the covered facility, meaning that the probability of causation was at least fifty percent. 20 C.F.R. §§ 30.210–.213[2]; see 42 U.S.C. § 7384n(b).

---

[2] The Court notes that the version of 20 C.F.R. § 30.210 in Westlaw does not accurately reflect the Code of Federal Regulations ("CFR") published in the Federal Register. The Court therefore relies on the 2019 annual edition of the CFR revised as of April 1, 2019 and available at https://www.govinfo.gov/content/pkg/CFR-2019-title20-vol1/pdf/CFR-2019-title20-vol1.pdf. (The Court also notes that a minor amendment to a cross-reference within 20 C.F.R. § 30.210 became effective April 9, 2019).

**Dose Reconstructions Under § 7384n**

"There are two methods set forth in the statute for claimants to establish that a cancer incurred by a covered worker is compensable." 42 C.F.R. § 83.0. These two methods are, effectively, two different ways to satisfy the third eligibility criteria (at-least-as-likely-as-not causation between an employee's cancer and prior DOE employment). The first method to establish causation is through the dose reconstruction process, which is handled by HHS. Id. It is HHS's responsibility to establish methods for arriving at and providing "reasonable estimates of the radiation doses received by individuals [seeking compensation] . . . for whom there are inadequate records of radiation exposure." Exec. Order No. 13,179, 65 Fed. Reg. at 77,488; see 42 U.S.C. § 7384n(d)(1). HHS interprets the term "reasonable estimates" to mean "estimates calculated using a substantial basis of fact and the application of science-based, logical assumptions to supplement or interpret the factual basis." Methods for Radiation Dose Reconstruction Under the Energy Employees Occupational Illness Compensation Program Act of 2000; Final Rule ("Methods for Radiation Dose Reconstruction"), 67 Fed. Reg. 22314, 22317 (May 2, 2002); see also 42 C.F.R. § 82.2(a) ("If radiation exposures in the workplace environment cannot be fully characterized based on available data, default values based on reasonable and scientific assumptions may be used as substitutes.").

In the dose reconstruction process, HHS uses various sources of information to estimate the internal and external radiation doses that an employee was exposed to while working at a covered facility.[3] See 42 C.F.R. §§ 82.14, 82.17. For example, when there is no personal monitoring data available for an employee, HHS may use sources such as monitoring data from

---

[3] An "internal" radiation dose is radiation exposure "from radioactive materials taken into the body" whereas an "external" dose is exposure "from radiation sources outside of the body." 42 C.F.R. § 82.5 (j)–(k).

coworkers subjected to a similar radiation environment, historical workplace monitoring information, general area radiation survey results, and air sampling data, as well as information about the processes involving radioactive materials, occupational tasks and locations, and radiation safety practices. Id.

In instances of scientific or factual uncertainty or unknowns, HHS applies assumptions that give the benefit of the doubt to the claimant. See Methods for Radiation Dose Reconstruction, 67 Fed. Reg. at 22317; see also 42 C.F.R. § 82.18 (stating that if "[HHS] cannot establish exposure conditions with sufficient specificity" to calculate the internal dose, then "the dose calculation will assume exposure conditions that maximize the dose to the organ under consideration").[4] HHS provides completed dose reconstructions to DOL, which then applies the dose reconstruction results together with certain medical and personal information provided by the claimant to calculate an estimated probability that the employee's cancer was caused by his employment at a covered DOE facility. 42 C.F.R. § 82.4; 20 C.F.R. §§ 30.213(a)–(b), 30.305; see 42 U.S.C. § 7384n(d)(1). A probability of causation greater than or equal to fifty percent satisfies the third criterion for compensation under the EEOICPA. 20 C.F.R. § 30.213.

**Special Exposure Cohorts Under § 7384q**

The second method to establish that a cancer incurred by a covered worker is compensable under the EEOICPA is to establish that the worker is a member of the Special Exposure Cohort (SEC). See 42 C.F.R. § 83.0. For workers who qualify as members of the SEC, the third criterion—that occupational radiation more likely than not caused the worker's cancer—is presumed, and there is no need for HHS to prepare a dose reconstruction. See id. To qualify as a

---

[4] HHS regulations do recognize, however, that "[i]t is uncertain whether adequate information . . . will be available to complete a dose reconstruction for every claim." 42 C.F.R. § 82.12. In those cases, HHS will notify the claimant in writing that a dose reconstruction cannot be completed and provide the basis for that finding. Id.

member of the SEC, an employee must meet the specific facility and work period requirements for an "SEC class" and have had at least one of 22 specified cancers. See id.; 42 U.S.C. §§ 7384l(9)(A), (14), (17); 20 C.F.R. § 30.5(gg) (listing 22 cancer types). This means that some workers may be part of an "SEC class" but not qualify for the SEC itself because they have not had one of the specified cancers.

HHS will identify a class of workers as an "SEC class" when it determines that "(1) it is not feasible to estimate with sufficient accuracy the radiation dose that the class received; and (2) there is a reasonable likelihood that such radiation dose may have endangered the health of members of the class." 42 U.S.C. § 7384q(b). It is not feasible to estimate with sufficient accuracy the class radiation dose if HHS does not have "access to sufficient information to estimate the maximum radiation dose, for every type of cancer . . . that could have been incurred in plausible circumstances by any member of the class, or . . . to estimate the radiation doses of members of the class more precisely than an estimate of the maximum radiation dose." 42 C.F.R. § 83.13(c)(1)(i).

Thus, the regulatory scheme to assess claims for compensation under the EEOICPA operates on two different tracks. One track is the dose reconstruction process under 42 U.S.C. § 7384n where HHS provides reasonable internal and external radiation dose estimates to DOL, and then DOL estimates the probability that the employee's cancer was caused by occupational radiation. The second track—the fast track—is inclusion in the SEC by having one of 22 cancers and being part of a class of workers that HHS designates to the SEC under 42 U.S.C. § 7384q.

## FACTUAL BACKGROUND[5]

Plaintiffs' father Arnold Young ("Mr. Young") was a DOE contract employee at Electro Metallurgical Company ("Electro Metallurgical") from 1941 to 1945 and at another facility from 1956 to 1971. Am. Compl. [ECF No. 17] ¶¶ 35–36. Both locations were covered DOE facilities under the EEOICPA. Notice of Final Decision Following Hearing, Ex. 1 to Am. Compl. ("Notice of Final Decision") [ECF No. 1-6] at 2.[6] Young was diagnosed with prostate cancer on March 21, 1984, and died on August 5, 1985. Id. In 2011, his surviving spouse, Dorothy Young, filed a claim for benefits under Part B of the EEOICPA. See id. Her claim was denied on April 18, 2012, because DOL, using a 2011 HHS dose reconstruction, determined that the probability that Young's cancer was related to his employment was "less than the 50% or greater threshold." See id. at 2–3 & n.1; NIOSH Report of Dose Reconstruction for Arnold Young dated Dec. 29, 2011 ("2011 Dose Reconstruction Report") [ECF No. 23-3] at 4.

### SEC Class Designation

In May 2012, HHS designated "all employees . . . at the Electro Metallurgical site . . . for the period from August 13, 1942 through December 31, 1947" as an "SEC class" because it could not estimate the internal radiation dose for those employees "with sufficient accuracy." SEC Petition Evaluation Report dated Jan. 31, 2012 ("2012 SEC Petition Evaluation Report") [ECF No. 23-4] at 39. Specifically, HHS determined that "[i]nternal monitoring data, work area radiological monitoring data, and source term data are not sufficient to provide a sufficiently accurate estimate of the bounding internal dose during this early period at Electro Metallurgical."

---

[5] At the motion to dismiss stage, the Court "treat[s] the complaint's factual allegations as true." Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000).

[6] For the purposes of this opinion, citations to the parties' exhibits use the pagination provided by the CM/ECF stamp on the docket entry.

Id. at 3. HHS found that "neither the bioassay nor the early limited air sampling data [were] sufficient to bound the dose," and that "[b]ased on health improvements described as occurring in late 1947, the internal dose related data collected after 1947 cannot be extrapolated to exposures occurring prior to 1948 at Electro Metallurgical." Id. at 4. In other words, HHS determined "[i]t was not feasible to estimate with sufficient accuracy how much higher the pre-1947 exposures were than the post-1947 exposures." Am. Compl. ¶ 45.

HHS reviewed the effects of this new "SEC class" designation on previously completed claims and determined that twenty-five of those claims met the criteria for inclusion in the SEC while thirty-nine did not. See Div. of Comp. Analysis & Supp., Program Evaluation Report: Electro Metallurgical Co., Ex. F to Defs.' Reply in Supp. of Defs.' Mot. to Dismiss Compl. ("Program Evaluation Report of Electro Metallurgical") [ECF No. 14-6] at 1–2. Dorothy Young's claim was one of the thirty-nine. Although plaintiffs' father was now part of an SEC class, he still did not qualify as a member of the SEC because he had not been diagnosed with one of the 22 specified cancers. See NIOSH Report of Dose Reconstruction for Arnold Young dated Dec. 16, 2016 ("2016 Dose Reconstruction Report") [ECF No. 23-6] at 6; see also 42 C.F.R. § 83.0; 20 C.F.R. § 30.5(gg) (listing the 22 types of cancers that qualify for the SEC, none of which is prostate cancer). Employees like Mr. Young who are part of an SEC class but do not qualify for the SEC do not enjoy the presumption that their cancer is related to occupational radiation. See Program Evaluation Report of Electro Metallurgical at 1–2. However, HHS will still conduct dose reconstructions for those employees, which DOL will use to assign a probability of causation. Id.

The 2012 SEC class designation affected the dose reconstruction process for employees like Mr. Young who worked at Electro Metallurgical between 1942 and 1947 but did not otherwise qualify for the SEC. In 2015, HHS generated a new "technical basis document" to use in preparing

dose reconstructions for Electro Metallurgical workers. <u>See</u> Technical Basis Doc. for the Electro Metallurgical Co. dated Sept. 24, 2015 ("2015 Technical Basis Doc.") [ECF No. 23-5]. Two major changes were made to the dose reconstruction process for workers at the facility as a result of the SEC class designation: First, HHS determined that because it is not feasible to estimate internal exposures with sufficient accuracy for all workers at the site for the period August 13, 1942, through December 31, 1947, it would not and could not conduct dose reconstructions for "unmonitored internal exposures during this time period." <u>Id.</u> at 5. HHS would, however, still reconstruct the internal dose for employees during the time period if there was any "personal monitoring data" available for them. <u>Id.</u> at 5, 17. Second, the new dose reconstruction process "incorporated a reevaluation of data and information [from] the SEC review process," which resulted in "an increased external dose estimate for all claims." Program Evaluation Report of Electro Metallurgical at 2.

### Mr. Young's 2016 Dose Reconstruction

In 2016, plaintiffs each filed a survivor's claim for benefits under the EEOICPA as the surviving adult children of Mr. Young. Notice of Final Decision at 3. DOL referred the claim to HHS so that HHS would provide a new dose reconstruction for Mr. Young based on the revised technical basis document. <u>Id.</u> at 3. Mr. Young's 2016 dose reconstruction differed from his 2011 dose reconstruction in two meaningful ways. First, "[t]he assigned internal dose decreased due to the special exposure cohort (SEC) for Electro Metallurgical." 2016 Dose Reconstruction Report at 7. In 2011, HHS had assigned Mr. Young an estimate of the internal radiation dose he was exposed to at Electro Metallurgical, relying primarily on air samples collected in various areas of the plant between 1948 and 1949. <u>See</u> 2011 Dose Reconstruction Report at 7–8; Technical Basis Doc. for Electro Metallurgical dated February 15, 2011 ("2011 Technical Basis Doc.") [ECF No.

23-2] at 6–7.  But in 2016, HHS did not estimate any internal dose for Mr. Young's employment at Electro Metallurgical because (1) HHS could not estimate the maximum internal dose of all employees in the SEC class with sufficient accuracy and (2) there were no personal dose monitoring records for Mr. Young.  2016 Dose Reconstruction Report at 8.

Second, although Mr. Young's total internal dose estimate decreased, "the assigned external dose increased . . . in accordance with the revised technical basis document for the Electro Metallurgical Company and the technical basis document for the Linde Ceramics Plant."  2016 Dose Reconstruction Report at 5.  DOL, applying Mr. Young's new 2016 dose reconstruction, determined that there was a 49.18% probability that Mr. Young's prostate cancer was related to his employment at the covered facilities.  Notice of Final Decision at 3.  Because the probability of causation was less than 50%, however, plaintiffs' claim for survivor benefits was not compensable under Part B of the EEOICPA.  Id. at 4.

**Procedural Background**

Following the 2016 denial of their claim, plaintiffs filed suit asking the Court to compel DOL to re-adjudicate their claim after a "complete dose reconstruction" is provided by HHS. Compl. [ECF No. 1] ¶¶ 7, 105.  The Court dismissed plaintiffs' initial complaint for lack of standing because plaintiffs sought a complete dose reconstruction and a re-adjudication of their claim for compensation without identifying or challenging a particular HHS regulation or final agency action.  See Young v. U.S. Dep't of Labor, No. 17-02428 (JDB), 2018 WL 3941948, at *3–5 (D.D.C. Aug. 16, 2018).  The Court held that "without a change in the underlying technical basis document, policy, or regulations, these requested remedies would lead to precisely the same result" and would therefore not redress the harm alleged.  Id. at *5.  The Court also dismissed plaintiffs' initial complaint because it failed to allege any causes of action.  Id.

Plaintiffs have now filed an amended complaint challenging "HHS's policy that where a determination has been made that a dose estimate cannot be performed with 'sufficient accuracy' for purposes of [designating a class of workers to the] SEC . . . HHS will not prepare a dose estimate for use in dose reconstructions . . . [for] claimants that are not eligible for the SEC." Am. Compl. ¶ 49.[7] Plaintiffs bring an APA claim alleging that HHS's policy—its method of determining whether a dose estimate is feasible—is "arbitrary and capricious and violates the language, structure, and spirit of the [EEOICPA]." Id. ¶ 8. They request that the Court order HHS to revise its technical basis documents and stop relying on the inappropriate "sufficient accuracy" standard used in the SEC class designation process under § 7384q to determine the feasibility of arriving at "reasonable" dose estimates under § 7384n. Id. ¶ 50. Plaintiffs also request that the Court set aside DOL's final decision denying plaintiffs' claim for compensation so that a new decision can be issued once a new dose reconstruction is performed. See id. ¶¶ 52–54.

HHS and DOL have once again moved to dismiss plaintiffs' amended complaint, this time for lack of standing under Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6). See Defs.' Mot. to Dismiss Am. Compl. ("Mot. to Dismiss") [ECF No. 19]. The Court heard oral argument on the government's motion to dismiss on March 4, 2020.

## LEGAL STANDARD

To survive a motion to dismiss for lack of subject-matter jurisdiction under Federal Rule

---

[7] In their briefing, plaintiffs recognize a slight caveat to HHS's alleged policy: HHS will prepare a dose estimate for employees that are not eligible for the SEC but for whom there is personal monitoring data available. See Pet'rs' Responding Mem. in Opp'n to Mot. to Dismiss ("Opp'n Br.") [ECF No. 21] at 8 (noting that the policy requires "[HHS] not to estimate internal dose for workers who were exposed at Electro Metallurgical from 1942-1947 and for whom specific internal monitoring data is not available"). Still, the thrust of plaintiffs' complaint—that HHS is not applying the usual dose reconstruction process and estimation efforts to employees who are part of a designated SEC class, but who do not individually qualify for the SEC—remains intact. See, e.g., id. at 27 ("[HHS] is quite capable of using coworker data, workplace monitoring data, process data, source material information, occupational task and location information and radiation safety practice information to prepare 'reasonable' dose estimates where dose data is extremely limited," but "after the [SEC] was established, those workers who did not qualify for the [SEC] would only receive a dose estimate if their own individual dose information was available.").

of Civil Procedure 12(b)(1), the plaintiff must establish the court's jurisdiction by a preponderance of the evidence.  Judicial Watch, Inc. v. Nat'l Archives & Records Admin., 845 F. Supp. 2d 288, 294 (D.D.C. 2012) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992)).  "In order to establish jurisdiction, a plaintiff must establish standing."  Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905, 913 (D.C. Cir. 2015).  "The plaintiff must demonstrate standing for each claim . . . and for each form of relief that is sought."  Town of Chester v. Laroe Estates, Inc., 137 S. Ct. 1645, 1650 (2017) (citation and quotation marks omitted).

At the motion to dismiss stage, courts "accept the well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor," but "do not assume the truth of legal conclusions, nor do [they] accept inferences that are unsupported by the facts set out in the complaint."  Arpaio v. Obama, 797 F.3d 11, 19 (D.C. Cir. 2015) (cleaned up). "The question at this early juncture in the litigation is whether plaintiffs have plausibly alleged standing . . . . [P]laintiffs need not yet establish each element of standing by a preponderance of the evidence."  In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig., 928 F.3d 42, 54 (D.C. Cir. 2019) (per curiam).  Finally, in reviewing a motion to dismiss under Rule 12(b)(1), the court "may consider such materials outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction to hear the case."  Scolaro v. D.C. Bd. of Elections & Ethics, 104 F. Supp. 2d 18, 22 (D.D.C. 2000).

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual allegations that, if accepted as true, "state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

<u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009). Determining a claim's plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." <u>Id.</u> at 679. Complaints "are to be construed with sufficient liberality to afford all possible inferences favorable to the pleader on allegations of fact." <u>Settles v. U.S. Parole Comm'n</u>, 429 F.3d 1098, 1106 (D.C. Cir. 2005).

## ANALYSIS

### I.    Standing

The government moves to dismiss plaintiffs' suit for lack of standing under Rule 12(b)(1). "To survive a motion to dismiss for lack of standing, a complaint must state a plausible claim that the plaintiff has suffered an injury in fact fairly traceable to the actions of the defendant that is likely to be redressed by a favorable decision on the merits." <u>Humane Soc'y of the U.S. v. Vilsack</u>, 797 F.3d 4, 8 (D.C. Cir. 2015).

### A.  Injury in Fact

An injury in fact must be "(1) concrete, (2) particularized, and (3) actual or imminent." <u>Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.</u>, 489 F.3d 1279, 1292 (D.C. Cir. 2007). A concrete injury is "direct, real, and palpable—not abstract." <u>Id.</u> A particularized injury is "personal, individual, distinct, and differentiated—not generalized or undifferentiated." <u>Id.</u> And an actual or imminent injury is "certainly impending and immediate—not remote, speculative, conjectural, or hypothetical." <u>Id.</u> at 1293.

Plaintiffs contend that their "injury" is the adjudication of their compensation claim with a "dose reconstruction that was prepared in direct violation of the EEOICPA statute"; it is the denial of their claims through "a process that was legally defective." Opp'n Br. at 31, 33. Plaintiffs also allege that "[a]n estimate of Mr. Young's pre-1947 internal exposure likely would have resulted

in an acceptance of his claim" because with just "the partial dose reconstruction, Mr. Young's new

probability of causation . . . was 49.18%, just . . . short of the 50% needed for compensation." Am.

Compl. ¶ 48.  The government argues that plaintiffs have not suffered an injury in fact because

they have no legally protected interest at stake.  Mot. to Dismiss at 18–19.  The government asserts

that because the EEOICPA does not guarantee benefits to claimants, nor impose any economic

cost on plaintiffs, or otherwise obligate them to take certain actions, plaintiffs have failed to allege

any threat to a concrete, particularized interest.  Id.

It is true that "an asserted right to have the Government act in accordance with law is not

sufficient, standing alone, to confer jurisdiction on a federal court."  Allen v. Wright, 468 U.S.

737, 754 (1984).  But "a plaintiff may have standing to challenge the failure of an agency to abide

by a procedural requirement . . . if that requirement was designed to protect some threatened

concrete interest of the plaintiff."  Fla. Audubon Soc'y v. Bentsen, 94 F.3d 658, 664 (D.C. Cir.

1996) (internal quotation marks omitted).  "[T]he plaintiff must show that the government act

performed without the procedure in question will cause a distinct risk to a particularized interest

of the plaintiff."  Id.

Here, as the government concedes, the EEOICPA confers the concrete benefit of

compensation to qualifying claimants, see Mot. to Dismiss at 18–19; 42 U.S.C. § 7384s, and

plaintiffs have alleged that HHS failed to abide by a procedural requirement (the use of methods

for arriving at reasonable estimates) in the administrative process that determines whether they

qualify for the concrete benefit of compensation, see Am. Compl. ¶¶ 43–50.  Such a procedural

injury in the adjudication of plaintiffs' EEOICPA compensation claim satisfies the injury-in-fact

requirement.  Cf. Berry v. United States Dep't of Labor, 832 F.3d 627, 633–34 (6th Cir. 2016)

(holding that that DOL's refusal to reopen plaintiff's workers' compensation claim for benefits

under the EEOICPA, despite being presented with new evidence of entitlement, was a "significant and 'concrete injury' to the claimant").

**B.  Causation & Redressability**

"In a case alleging a procedural injury, [courts] relax the redressability and imminence requirements of standing." Ctr. for Biological Diversity v. Envt'l Prot. Agency, 861 F.3d 174, 182 (D.C. Cir. 2017) (internal quotation marks omitted).  Plaintiffs must show two causal links: "one connecting the omitted procedural step to some substantive government decision that may have been wrongly decided because of the lack of that procedural requirement and one connecting that substantive decision to the plaintiff's particularized injury." Id. at 184 (brackets and internal quotation marks omitted).  "Importantly, with respect to the first link, the party seeking to establish standing need not show that but for the alleged procedural deficiency the agency would have reached a different substantive result." Id.  "All that is necessary is to show that the procedural step was connected to the substantive result." Sugar Cane Growers Coop. of Fla. v. Veneman, 289 F.3d 89, 94–95 (D.C. Cir. 2002).  "Regarding the second link, a plaintiff must still demonstrate a causal connection between the agency action and the alleged injury." Ctr. for Biological Diversity, 861 F.3d at 184 (internal quotation marks omitted).  But a plaintiff need not establish that its concrete injury "in fact resulted from . . . procedural failures"—it need only demonstrate that there is a "substantial probability" that the agency's substantive decision harmed plaintiff's concrete interests. Id. 184–85.

Here, plaintiffs have plausibly alleged both causal links.  First, they allege that HHS's policy of using the "with sufficient accuracy" standard under § 7384q to determine the feasibility of arriving at "reasonable" dose estimates under § 7384n may have resulted in a wrong, or incomplete, dose reconstruction for Mr. Young. See Am. Compl. ¶¶8–9, 45–47; see also 2016

Dose Reconstruction Report at 7 ("The assigned internal dose decreased due to the special exposure cohort (SEC) for Electro Metallurgical."). Plaintiffs further allege that, according to HHS's own assessment, Mr. Young's actual internal dose was likely <u>higher</u> than the internal dose he was previously assigned in 2011, since that 2011 dose was based on data collected from the facility after it instated enhanced safety measures. Am. Compl. ¶¶ 45–47. However, instead of making a new estimate or using the under-estimate from 2011, HHS assigned Mr. Young no internal dose at all for his employment at Electro Metallurgical on the grounds that it had determined, in the SEC class-designation process, that it could not estimate the dose with sufficient accuracy, meaning it could not estimate the maximum internal radiation dose for all workers at Electro Metallurgical between 1942 and 1947. <u>See</u> <u>id.</u> ¶ 46. Thus, plaintiffs have sufficiently alleged a connection between the alleged procedural error and HHS's 2016 dose reconstruction for Mr. Young.

Plaintiffs also plausibly allege that there is a substantial probability that HHS's 2016 dose reconstruction for Mr. Young caused DOL to deny their claim for compensation. DOL used the 2016 dose reconstruction to calculate an estimated probability that Mr. Young's cancer was caused by occupational radiation exposure, <u>see</u> 42 C.F.R. § 82.4, and then denied plaintiffs' claim because the probability was 49.18% instead of 50%. <u>See</u> Am. Compl. ¶¶ 13–14; Notice of Final Decision at 3–4. Given that the calculated probability was just 0.82% short of 50%, and that shortfall was the basis on which DOL denied plaintiffs' claim, plaintiffs have plausibly alleged a substantial probability that the 2016 dose reconstruction (the agency's substantive decision that was subject to a procedural defect) caused DOL to deny plaintiffs' claim for compensation (plaintiffs' particularized injury).

With respect to redressability, a "plaintiff need not show that court-ordered compliance with the procedure would alter the final agency decision." <u>Ctr. for Biological Diversity</u>, 861 F.3d at 185 (internal quotation marks and brackets omitted). Instead, plaintiffs need only show that, but for the procedural defect, the agency "<u>could</u> reach a different conclusion." <u>Id.</u> Here, plaintiffs have plausibly alleged that, but for the alleged procedural defect, HHS's 2016 dose reconstruction may have assigned Mr. Young a higher internal radiation dose. Plaintiffs have also plausibly alleged that such a revised dose reconstruction would "significant[ly] increase . . . the likelihood" that DOL would favorably adjudicate plaintiffs' claim for compensation. <u>Nat'l Parks Conservation Ass'n v. Manson</u>, 414 F.3d 1, 7 (D.C. Cir. 2005) (quoting <u>Utah v. Evans</u>, 536 U.S. 452, 464 (2002)). Plaintiffs allege that "[a]n estimate of Mr. Young's pre-1947 internal exposure likely would have resulted in an acceptance of his claim" given that Mr. Young was less than 1% short of the 50% needed for compensation, and that "[u]nprotected exposure to radioactive dust between 1943 and 1945 at Electro Metallurgical is not an insignificant internal exposure to radiation." Am. Compl. ¶ 48.

The government argues that plaintiffs' motion should be dismissed for lack of standing because plaintiffs have not shown that a "favorable decision by this Court would result in additional dose value being attributed to Plaintiffs' dose reconstruction, or that such added dose value would likely result in DOL adjudicating the claim favorably." Mot. to Dismiss at 25. But, as explained, plaintiffs need not show that a favorable decision by this Court would in fact result in additional dose value being attributed to Mr. Young's dose reconstruction, <u>see</u> <u>Ctr. for Biological Diversity</u>, 861 F.3d at 184; plaintiffs have plausibly alleged that there is a substantial probability that a revised dose reconstruction that assigned Mr. Young an internal dose for his employment at Electro Metallurgical would result in a probability of causation of at least 50% and

therefore a favorable adjudication of plaintiffs' claim for compensation, see Am. Compl. ¶¶ 13, 48. No more is needed.

It is true that this is not an "archetypal procedural injury" case where "the same actor [is] responsible for the procedural defect and the injurious final agency action." Nat'l Parks Conservation Ass'n, 414 F.3d at 5. Instead, HHS is responsible for the procedural defect and the 2016 dose reconstruction, but it is DOL that used the dose reconstruction in evaluating, and ultimately denying, plaintiffs' claim for compensation. While plaintiffs' alleged injuries arise from a single interagency process, "the ultimate source of injury" is arguably "two steps removed from the alleged procedural defect." Id.

But that is no obstacle to standing. For example, in Nat'l Parks, plaintiffs alleged that the EPA decided to withdraw an adverse-impact letter regarding the construction of a coal-fired power plant near Yellowstone National Park without considering the plant's impact on air quality, which, in turn, caused a state agency to grant a construction permit for the plant. Id. at 5–6. Even though EPA's decision to withdraw the adverse-impact letter did not directly harm plaintiffs' interests in clean air, the court found that the plaintiffs had a concrete interest in ensuring EPA's reasoned approach to such a determination. Id. Likewise here, even though HHS's dose estimates do not directly result in the denial of plaintiffs' claim for compensation, plaintiffs have a concrete interest in ensuring a lawful dose reconstruction process because HHS's dose estimates will affect DOL's assessment of their compensation claim.

In Nat'l Parks, the court did not require plaintiffs to show that, but for the procedural error, the federal agency would not have withdrawn the adverse impact-letter, but it did require plaintiffs to show a causal link between the federal agency's decision and the state's permitting decision. So, too, plaintiffs do not need to establish that but for HHS's failure to apply the proper standard

for determining the feasibility of dose estimates, HHS would have estimated an internal dose for Mr. Young, but plaintiffs <u>do</u> need to establish a causal link between HHS's dose reconstruction and DOL's adjudication of plaintiffs' claim. "Regardless whether [plaintiffs'] injury is procedural or substantive in nature, the question of standing must turn on the strength of the link between [the agency's] action and the ultimate [injurious] decision." <u>Id.</u> at 5. And here, plaintiffs have plausibly alleged a close causal relationship between HHS's 2016 partial dose reconstruction for Mr. Young and DOL's denial of plaintiffs' claim for compensation.

Finally, the government lists several other arguments why plaintiffs lack standing that are more properly construed as reasons why plaintiffs have failed to state a claim or will otherwise lose on the merits. For example, the government argues that plaintiffs' assertion of injury in fact "is premised on their erroneous legal conclusion that when EEOICPA requires the provision of a reasonable dose estimate, it means to provide a 'complete' dose estimate," and that plaintiffs "erroneously infer" an HHS policy that doesn't exist. Mot. to Dismiss at 19–20. Similarly, the government argues that plaintiffs' injuries are not redressable because HHS "used the correct 'reasonable' standard in conducting Mr. Young's dose reconstructions," so the outcome would be no different if HHS were instructed to provide a dose reconstruction based on "reasonable" estimates once more. <u>See</u> <u>id.</u> at 23.

These arguments challenging plaintiffs' legal theory of the case are more properly considered under Rule 12(b)(6), as the Court will do shortly. <u>See</u> <u>In re Navy Chaplaincy</u>, 534 F.3d 756, 760 (D.C. Cir. 2008) ("In reviewing the standing question, we must . . . assume that on the merits the plaintiffs would be successful in their claims." (internal quotation marks omitted)); <u>Animal Legal Def. Fund, Inc. v. Glickman</u>, 154 F.3d 426, 441 (D.C. Cir. 1998) ("[A] party need not <u>prove</u> that the agency action it attacks is unlawful . . . in order to have standing to level that

attack." (quotation omitted)); see also Campbell v. Clinton, 203 F.3d 19, 23 (D.C. Cir. 2000) (warning against "conflat[ing] standing with the merits"). In short, jurisdiction is not "defeated . . . by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover." Bell v. Hood, 327 U.S. 678, 682 (1946).

*     *     *

The Court concludes that, at this early stage of the litigation, plaintiffs satisfy the standing requirements because they plausibly allege that (1) HHS failed to abide by a procedural requirement designed to protect plaintiffs' concrete interest in securing compensation under the EEOICPA; (2) the procedural violation is connected to HHS's 2016 dose reconstruction; and (3) there is a substantial probability that the 2016 dose reconstruction caused DOL to calculate a probability of causation just short of 50% and deny plaintiffs' claim for compensation. If HHS conducts a new dose reconstruction applying the proper standard for determining the feasibility of reasonable estimates, then, plaintiffs allege, HHS may estimate Mr. Young's internal dose at Electro Metallurgical, which would likely lead to a favorable adjudication of plaintiffs' claim for compensation.

## II.     Failure to State a Claim (HHS)

The government also moves to dismiss plaintiffs' complaint under Rule 12(b)(6), arguing that plaintiffs can prove no set of facts in support of their claim against HHS that would entitle them to relief. See Mot. to Dismiss at 25. Plaintiffs challenge an alleged HHS policy as unlawful under the APA, 5 U.S.C. § 702. Am. Compl. ¶ 49. "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review" under the APA. 5 U.S.C. § 704. The reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be," among other things, "arbitrary, capricious,

an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; . . . [or] without observance of procedure required by law." 5 U.S.C. § 706. In short, to state a claim for relief under the APA, plaintiffs must plausibly allege that a final agency action is arbitrary and capricious or otherwise not in accordance with the law.

## A. Final Agency Action

The government argues that plaintiffs fail to state a claim under the APA because they fail to identify a "final agency action." Mot. to Dismiss at 28–29 (citing 5 U.S.C. § 704). According to the government, the alleged policy that plaintiffs challenge does not exist, and even if it does, it does not constitute "final" agency action.

### i. Existence of HHS's Alleged Policy

Plaintiffs challenge a "policy that where a determination has been made that a dose estimate cannot be performed with 'sufficient accuracy' for purposes of an SEC . . . HHS will not prepare a dose estimate for use in dose reconstructions" for "claimants that are not eligible for the SEC." Am. Compl. ¶ 49. Plaintiffs claim that this is "an inappropriate standard for determining feasibility of dose estimates for dose reconstructions performed for workers who do not qualify for the SEC presumption of causation." Id. ¶¶ 23–24. They claim that this policy—"[t]his method of determining whether a dose estimate is feasible (using a 'sufficiently accurate' standard instead of a 'reasonableness' standard)"—is "arbitrary and capricious and violates the language, structure, and spirit of the [EEOICPA]." Id. ¶ 8.

The government responds that this "unnamed and unidentified 'policy' allegedly embraced by HHS . . . does not exist." Mot. to Dismiss at 29–30. But plaintiffs' complaint, "construed with sufficient liberality to afford all possible inferences favorable to [them]," Settles, 429 F.3d at 1106,

plausibly alleges such a policy exists. Plaintiffs' complaint points to several agency documents that indicate that HHS, as a matter of policy, will not estimate a radiation dose if it previously determined that it could not estimate the dose "with sufficient accuracy" for a class of workers under § 7384q and there is no personal monitoring data available. See Am. Compl. ¶¶ 23–24. HHS's 2015 Technical Basis Document for dose reconstructions for workers at Electro Metallurgical states:

> NIOSH has determined, and the Secretary, Health and Human Services has concurred that it is not feasible to estimate internal exposures with sufficient accuracy for all workers at the site for the period August 13, 1942 through December 31, 1947 at the Electro Metallurgical Company (NIOSH 2012, HHS 2012). Any available personal monitoring data should be used to reconstruct an individual's exposure at Electro Metallurgical during this time period. <u>However, unmonitored internal exposures during this time period cannot be reconstructed.</u>

2015 Technical Basis Doc. at 5 (emphasis added).

Furthermore, in response to public comments expressing concern that HHS was conflating the "reasonable estimates" standard in § 7384n with the "sufficient accuracy" standard in § 7384q, HHS stated:

> The statutory provisions concerning the development of dose reconstruction methods (42 U.S.C. 7384n(d)) are concerned with how dose reconstructions are to be done, not a determination as to whether or not they can be done. <u>It is implicit, nonetheless, that these dose reconstructions must be "feasible to estimate with sufficient accuracy."</u> It appears to HHS that the use of this phrase under provisions for considering the addition of classes of employees to the Cohort, and the omission of this phrase under provisions concerning dose reconstruction, simply reflects the fact that these two separate provisions of EEOICPA address different but complementary circumstances.

Procedures for Designating Classes of Employees as Members of the Special Exposure Cohort Under the EEOICPA; Final Rule, 69 Fed. Reg. 30,764, 30,769 (May 28, 2004) (emphasis added).[8]

---

[8] Additionally, though not referenced in their amended complaint, plaintiffs' briefing cites a notice of proposed rulemaking relating to the establishment of additional members of the SEC, see Opp'n Br. at 15–16, that states:

Together, these statements indicate that HHS has a policy under which it will not calculate a "reasonable estimate" of a radiation dose when there is no personal monitoring data available and it has already determined that it cannot estimate the dose "with sufficient accuracy" under 42 U.S.C § 7384q, meaning it has determined that it does not have access to sufficient information to estimate the "maximum" radiation dose that could have been incurred in plausible circumstances by any worker at the facility during the relevant time period.[9]

ii. Finality of HHS's Alleged Policy

Because plaintiffs plausibly allege the existence of an HHS policy, the next question is whether that policy is a "final" agency action. A final agency action must (1) "mark 'the consummation' of the agency's decisionmaking process" and not be of a "merely tentative or interlocutory nature," and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." Bennett v. Spear, 520 U.S. 154, 177–78 (1997) (internal quotation marks omitted).

First, plaintiffs plausibly allege facts establishing that HHS's policy is a "consummation" of a decision-making process. Plaintiffs allege that the policy is binding and is incorporated into

---

"The determination by the Secretary to add a class of employees to the Cohort does, however, have implications for the conduct of dose reconstructions for these members of the Cohort. When HHS adds members to the Cohort, HHS will have determined that radiation doses for those members cannot be estimated with sufficient accuracy. Hence NIOSH may not be able to complete dose reconstructions for these members.

Procedures for Designating Classes of Employees as Members of the Special Exposure Cohort Under the EEOICPA; Notice of Proposed Rulemaking, 68 Fed. Reg. 11294, 11302–03 (March 7, 2003) (emphasis added).

[9] At the hearing, the government highlighted the fact that HHS conducted new dose reconstructions for 39 workers who, like Mr. Young, were part of the SEC-designated class of workers at Electro Metallurgical but who did not otherwise qualify for the SEC. Mot. to Dismiss at 9–10. But the alleged policy is not that HHS will not attempt a dose reconstruction; it is that it will not attempt to estimate the particular dose that it previously determined it could not estimate "with sufficient accuracy" under § 7384q. The record does not suggest that HHS estimated any of those 39 workers' internal radiation doses at Electro Metallurgical between 1942-1947 absent personal monitoring data. See Program Evaluation Report of Electro Metallurgical at 1–2. The fact that 20 of the 39 claimants who received a partial dose reconstruction like Mr. Young secured a probability of causation above 50% does not call into question the existence of HHS's alleged policy. See id.

HHS's technical guidance documents used to conduct dose reconstructions for DOE workers, like Mr. Young, who are part of an SEC class but do not themselves qualify for the SEC. See Am. Compl. ¶¶ 49–50; 2015 Technical Basis Doc. at 5; see also 20 C.F.R. § 30.318(a) (noting that HHS's methods for arriving at reasonable estimates are "binding" on DOL).

The government argues that HHS's alleged policy does not mark the consummation of the agency's decision-making process because it is only part of the overall dose reconstruction process, which is only part of DOL's assessment of plaintiffs' claim for compensation. See Mot. to Dismiss at 31. But a policy can be final even if it is a policy within a larger decision-making process. See, e.g., Jafarzadeh v. Nielsen, 321 F. Supp. 3d 19, 41 (D.D.C. 2018) (stating that DHS's "administrative application handling protocol" used to review applications for lawful permanent residence "clearly represents the consummation of the agency's decision-making on the question of how to handle applications of individuals with national security concerns"). Furthermore, the government's argument "confuses the question whether the [agency's] action is final with the separate question whether [plaintiffs'] harm is 'fairly traceable' to the [agency's] action." Bennett, 520 U.S. at 177. An agency's decision may still be final even if it is made to inform another agency's decision, which will in turn impact plaintiffs' concrete interests. See Chem. Mfrs. Ass'n v. E.P.A., 26 F. Supp. 2d 180, 183 (D.D.C. 1998) (citing Bennett, 520 U.S. at 157).

Second, plaintiffs plausibly allege facts that establish that legal consequences will flow from HHS's alleged policy. Determining whether "legal consequences will flow" from an agency action is a "pragmatic" inquiry. U.S. Army Corps of Eng'rs v. Hawkes Co., 136 S. Ct. 1807, 1813 (2016) (citing Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967)). The inquiry should be "based on the concrete consequences an agency action has or does not have as a result of the specific statutes and regulations that govern it." Cal. Comtys. Against Toxics v. EPA, 934 F.3d 627, 637

(D.C. Cir. 2019). Here, plaintiffs plausibly allege that the policy affected Mr. Young's dose estimates, which in turn impacted DOL's assessment of plaintiffs' claims for compensation under the EEOICPA. The policy, plaintiffs allege, had legal consequences because it increased the probability that plaintiffs' claims for compensation will be denied. See Ipsen Biopharmaceuticals, Inc. v. Azar, 943 F.3d 953, 956–57 (D.C. Cir. 2019) (holding "legal consequences flowed" from agency's letters because they "increased the probability" that plaintiff could be subjected to a statutory civil penalty for "knowingly provid[ing] false information" (brackets and citation omitted)).

*    *    *    *    *

Thus, plaintiffs plausibly allege the existence of an HHS policy that constitutes a final agency action reviewable by this Court under the APA.

## B. Arbitrary and Capricious or Otherwise Unlawful

The government next argues that plaintiffs fail to state a claim because plaintiffs' claim rests entirely on the "unfounded legal conclusion that 'sufficient accuracy' is of a higher evidentiary standard than the 'reasonableness' standard." Mot. to Dismiss at 27. But the plain text of the standards are meaningfully different. HHS interprets the term "reasonable estimates" in 42 U.S.C § 7384n to mean "estimates calculated using a substantial basis of fact and the application of science-based, logical assumptions to supplement or interpret the factual basis." Methods for Radiation Dose Reconstruction, 67 Fed. Reg. at 22317. By contrast, HHS regulations state that radiation doses can be estimated "with sufficient accuracy" under 42 U.S.C § 7384q only if HHS has "access to sufficient information to estimate the maximum radiation dose, for every type of cancer . . . that could have been incurred in plausible circumstances by any member of the

class, or . . . to estimate the radiation doses of members of the class more precisely than an estimate of the maximum radiation dose." 42 C.F.R. § 83.13(c)(1)(i).

Plaintiffs contend that HHS's determination that it cannot plausibly estimate the "maximum radiation dose, for every type of cancer . . . that could have been incurred . . . by any member of the class" does not necessarily mean that HHS cannot calculate a reasonable estimate for a single employee in the dose reconstruction process. See Am. Compl. ¶¶ 42–48; Opp'n Br. at 22–29. Plaintiffs recognize that HHS will still calculate an estimate for an employee's dose reconstruction if there is personal monitoring data available, see Opp'n Br. at 8, but they challenge HHS's assumption that the only way to calculate an individual's radiation dose estimate "using a substantial basis of fact and the application of science-based, logical assumptions" is to (1) estimate the maximum radiation dose for all members of the class of workers to which the employee belongs or (2) analyze personal monitoring data.

It may very well be that those are the only two methods for calculating "reasonable estimates" of workers' radiation doses. It may also be true that whether it is feasible to estimate a dose "with sufficient accuracy" under 42 U.S.C § 7384q is the proper standard for determining whether it is feasible to prepare "reasonable estimates" of workers' radiation doses (absent personal monitoring data) under 42 U.S.C § 7384n. But the Court cannot determine at this stage of the proceedings whether that narrower interpretation of "reasonable estimate" is lawful because there is no administrative record that articulates the agency's reasons for adopting such an interpretation. At the hearing, counsel for HHS tried to explain to the Court why estimating a minimum internal dose for Mr. Young would not be scientific, claiming that HHS has considered and rejected alternative methods for arriving at reasonable estimates. See March 4, 2020 Hr'g Tr.

("Hr'g Tr.") [ECF No. 28] at 25:17–27:25.  But none of that analysis appears in the administrative record presently before the Court.

"The 'requirement that agency action not be arbitrary and capricious includes a requirement that the agency adequately explain its result.'" Snohomish Cty., Washington v. Surface Transportation Bd., No. 19-1030, 2020 WL 1482397, at *7 (D.C. Cir. Mar. 27, 2020) (quoting Jost v. Surface Transp. Bd., 194 F.3d 79, 85 (D.C. Cir. 1999).  The agency "must articulate the reasoning behind its decision with sufficient clarity to enable petitioners and this court to understand the basis for its decision." Jost, 194 F.3d at 88.  "Without the administrative record, the court is unable to perform this function." Swedish Am. Hosp. v. Sebelius, 691 F. Supp. 2d 80, 88 (D.D.C. 2010).

Furthermore, plaintiffs' claim that HHS's alleged policy is arbitrary and capricious and inconsistent with 42 U.S.C. § 7384n is buttressed by the specific facts of this case.  Here, HHS decided that it could not estimate the maximum radiation dose for all workers at Electro Metallurgical between 1942 and 1947 because the 1948 air sampling data that it previously relied on to calculate those workers' internal doses underestimated the radiation that workers were exposed to.  2012 SEC Petition Evaluation Report at 3–4; see Am. Compl. ¶ 46.  The 1948 data could not be used to determine the plausible maximum dose for pre-1947 workers because health improvements to the air system were made in late 1947.  2012 SEC Petition Evaluation Report at 4.  Even though HHS's own assessment suggests that Mr. Young's 2011 internal dose estimate was an underestimate, plaintiffs allege that HHS's policy required that Mr. Young receive an even lower internal dose of zero, giving him no credit for any internal radiation exposures during his time working at Electro Metallurgical.  In a compensation regime where "the benefit of the doubt" is to be given to the claimant "in cases of scientific or factual uncertainty or unknowns," see

Methods for Radiation Dose Reconstruction, 67 Fed. Reg. at 22317, plaintiffs have plausibly alleged that it is arbitrary and capricious, or otherwise unlawful, to assign Mr. Young an internal dose of zero when the data suggests he was likely exposed to <u>more</u> radiation than workers from 1948 who <u>are</u> receiving internal dose estimates for their time at Electro Metallurgical.

In sum, the "with sufficient accuracy" standard (as defined by HHS's regulation) is—on the plain text—a narrower, more specific standard than the "reasonable estimates" standard, and this Court presently has no administrative record upon which to assess HHS's reasons for relying, as a matter of policy, on the "with sufficient accuracy" standard in determining whether it is feasible to prepare reasonable estimates of workers' radiation doses without personal monitoring data. On top of that, plaintiffs' arbitrary and capricious claim is buttressed by the facts alleged in this case where HHS assigned Mr. Young an internal dose of zero despite recognizing that the 2011 internal dose estimate for Mr. Young was likely an <u>underestimate</u> of his radiation exposure.

\*     \*     \*

At this time, then, given the limited administrative record before the Court, plaintiffs have stated a claim for relief against HHS under the APA.

## III.     Failure to State a Claim (DOL)

Plaintiffs' complaint does not state a cause of action against DOL and plaintiffs do not allege that DOL has, itself, done anything arbitrary or capricious or otherwise unlawful. <u>See</u> Hr'g Tr. at 49:18–22. Plaintiffs state that DOL denied their compensation claim based on HHS's unlawful dose reconstruction, but "the HHS dose reconstruction regulation . . . is binding on" DOL. 20 C.F.R. § 30.318   At the hearing, plaintiffs conceded that "the Department of Labor didn't have much choice in the matter." Hr'g Tr. at 49:9–12.

Moreover, while plaintiffs' complaint requests that the Court "set aside [DOL's] final decision" and order DOL to re-adjudicate plaintiffs' claim, see Am. Compl. ¶¶ 52–54, plaintiffs have not established why such relief is necessary.  The regulations allow DOL to reopen a claim after it has issued a final decision if there has been "a change in the dose reconstruction methods." 20 C.F.R. § 30.320.  If this Court ordered HHS to stop applying the allegedly unlawful policy, then plaintiffs could make a written request for DOL to reopen and re-evaluate their claim for compensation in accordance with the corrected dose reconstruction method.  See id.  Plaintiffs have agreed that this avenue for relief would be available to them and that they "would have no problem with such a ruling."  See Tr. Hr'g at 49:23–50:4.  Because plaintiffs fail to state a claim against DOL and their alleged injuries can be fully redressed without the Court enforcing relief against DOL, the Court will grant the government's motion to dismiss as to all claims against DOL and dismiss DOL as a party to this suit.

## CONCLUSION

For the foregoing reasons, this Court will grant in part and deny in part the government's motion to dismiss.  In particular, the Court will grant the motion as to DOL, but deny the motion as to HHS because plaintiffs have plausibly alleged standing to bring suit and stated a claim for relief against HHS under the APA.

_____/s/_____
JOHN D. BATES
United States District Judge

Dated:  April 1, 2020